## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**IN THE MATTER OF OFFSHORE OIL SERVICES, INC.**

**CIVIL ACTION**

**NO.  21-1522**

**SECTION: "E" (2)**

### ORDER AND REASONS

Before the Court is a Motion for Summary Judgment ("Motion") filed by Third Party Defendant Island Operating Company, Inc. ("IOC" or "Defendant").[1] Third Party Plaintiff Offshore Oil Services, Inc. ("Offshore" or "Plaintiff") opposes.[2] IOC filed a reply.[3] Offshore filed a sur-reply with leave of Court.[4] The Court held a status conference with the parties on February 16, 2023, where, *inter alia*, IOC's Motion was discussed.[5] During the status conference, the Court granted Offshore further leave of Court to file a second sur-reply,[6] which Offshore did.[7] IOC then filed a supplemental reply.[8] For the reasons that follow, IOC's Motion is **GRANTED IN PART** and **DENIED IN PART**.

### BACKGROUND

This action arises out of a limitation of liability petition filed by Offshore on August 11, 2021.[9] Offshore is the owner and operator of the M/V *Anna M* ("vessel"), seeking

---

[1] R. Doc. 65.

[2] R. Doc. 68.

[3] R. Doc. 72.

[4] R. Doc. 75.

[5] R. Doc. 79.

[6] *Id.*

[7] Offshore lodges an objection to any new arguments made and evidence presented in IOC's reply. *See* R. Doc. 70 at p. 2. First, there is no new evidence presented in IOC's reply. *See* R. Doc. 72. Second, to the extent there are "new arguments" in IOC's reply, Offshore was granted leave of Court to file a sur-reply in this case—on two occasions. *See* R. Docs. 74, 79. Subsequently, Offshore filed two sur-replies. *See* R. Docs. 75, 83. The Fifth Circuit instructs that courts may consider new arguments in a reply brief provided "the court [] give[s] the non-movant an adequate opportunity to respond prior to its ruling." *Vais Arms, Inc. v. Vais*, 383 F.3d 287, 292 (5th Cir.2004). The Court has done so in this case.

[8] R. Doc. 84.

[9] R. Doc. 1.

exoneration from and/or limitation of liability for an alleged injury that occurred to claimant, Tyrone Felix, during a personnel basket transfer from the deck of the vessel to a Fieldwood Energy, LLC ("Fieldwood") platform, an offshore oil and gas production platform.[10] Felix, an employee of IOC, alleged he sustained injuries to his knee, neck, and back.[11] Felix has filed a claim against Offshore in the underlying limitation action,[12] as has IOC's federal and state compensation insurer, Louisiana Workers' Compensation Corporation, in connection with Felix's alleged incident.[13]

On May 26, 2022, Offshore filed a third-party demand against IOC,[14] in which Offshore brings three claims pursuant to the Master Services Contract ("MSC") between IOC and Fieldwood: (1) a claim for indemnity for the claims brought by Felix and Louisiana Workers' Compensation Corporation; (2) a claim for indemnity insurance coverage "for any damages" Offshore "may be found to" owe; and (3) a claim for defense costs.[15] With respect to defense costs and indemnification, the MSC includes an indemnity provision, pursuant to which IOC agrees to defend and indemnify, *inter alia*, Offshore for personal injuries sustained by IOC's respective employees regardless of fault.[16] Specifically, the MSC provides:

> CONTRACTOR[17] [*i.e.*, IOC] HEREBY AGREES TO RELEASE, INDEMNIFY, PROTECT, DEFEND AND HOLD HARMLESS SUCH OTHER THIRD PARTY CONTRACTOR(S)[18] [*i.e.*, Offshore] (AND ANY SUCH THIRD PARTY CONTRACTOR GROUP) FROM AND AGAINST ANY AND ALL CLAIMS FOR (1) THE INJURY, ILLNESS OR DEATH OF

---

[10] *Id.* at p. 2.
[11] *Id.*
[12] R. Doc. 4.
[13] R. Doc. 5.
[14] R. Doc. 30.
[15] *Id.* at p. 30, ¶ 22. These claims are collectively referred to as the "indemnity claims."
[16] R. Doc. 75-2 at ¶ 11. R. Doc. 89-1 at ¶ 11. *See* R. Doc. 75-4 at 5.
[17] The MSC defined "Contractor" as IOC. *See* R. Doc. 38-1 at p. 1.
[18] The MSC defined "Third Party Contractor" as any other contractor, other than IOC, used or employed by Fieldwood. *Id.* at p. 6. Offshore was a contractor used or employed by Fieldwood.

ANY MEMBER OF CONTRACTOR GROUP[19] [*i.e.*, IOC's employee Mr. Felix] AND/OR (2) THE LOSS, DAMAGE, DESTRUCTION AND/OR WRECK AND DEBRIS REMOVAL OF ANY PROPERTY BELONGING TO ANY MEMBER OF CONTRACTOR GROUP, WITHOUT REGARD TO WHETHER ANY SUCH CLAIM IS CAUSED, IN WHOLE OR IN PARTY, BY THE NEGLIGENCE (WHETHER SOLE, JOINT OR CONCURRENT; ACTIVE OR PASSIVE), STRICT LIABILITY, STATUTORY LIABILITY, CONTRACTUAL LIABILITY OR OTHER FAULT (EXCLUDING ONLY THE GROSS NEGLIGENCE AND INTENTIONAL MISCONDUCT) OF ANY MEMBER OF THE THIRD PARTY CONTRACTOR GROUP OR BY ANY DEFECT OR PRE-EXISTING CONDITION (WHETHER KNOWN OR UNKNOWN; PATENT, LATENT OR OTHERWISE).[20]

With respect to indemnity insurance coverage, the MSC also provides "[IOC] agrees that it will support its [] indemnity obligations . . . with insurance . . . ."[21]

On July 8, 2022, IOC filed a Motion to Dismiss Third-Party Demand or, in the alternative, Motion for Summary Judgment ("MTD/MSJ").[22] On July 28, 2022, the Court held a status conference with the parties to discuss IOC's MTD/MSJ.[23] IOC "informed the Court" of its intention to withdraw its MTD/MSJ because "[t]he parties agree[d]" a motion for "summary judgment [wa]s the appropriate vehicle for determin[ing] the issues raised in IOC's [MTD/MSJ] and that additional discovery [wa]s needed."[24] Thereafter, upon joint motion of the parties, the Court put in place a discovery order "outlining the discovery needed prior to submission of [IOC's] motion for summary judgment."[25] That period of discovery has concluded, and IOC now moves for summary judgment,[26] asserting the defense, indemnity, and insurance coverage provisions in the MSC are null and void under the Louisiana Oilfield Indemnity Act ("LOIA"). Offshore opposes.[27]

---

[19] The MSC defined "Contractor Group" as IOC, IOC's affiliates, IOC's subcontractors, and IOC's employees. *Id.*

[20] *Id.* at pp. 7-9.

[21] *Id.* at p. 8.

[22] R. Doc. 38.

[23] R. Doc. 44.

[24] *Id.* at p. 1.

[25] *See* R. Doc. 55; *see also* R. Doc. 44.

[26] R. Doc. 65.

[27] R. Docs. 68, 75, 83.

## LEGAL STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[28] "An issue is material if its resolution could affect the outcome of the action."[29] When assessing whether a material factual dispute exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[30] All reasonable inferences are drawn in favor of the nonmoving party.[31] There is no genuine issue of material fact if, even viewing the evidence in the light most favorable to the nonmoving party, no reasonable trier of fact could find for the nonmoving party, thus entitling the moving party to judgment as a matter of law.[32]

If the dispositive issue is one on which the moving party will bear the burden of persuasion at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'"[33] If the moving party fails to carry this burden, the motion must be denied. If the moving party successfully carries this burden, the burden of production then shifts to the nonmoving party to direct the Court's attention to something in the pleadings or other evidence in the record setting forth specific facts sufficient to establish that a genuine issue of material fact does indeed exist.[34]

If the dispositive issue is one on which the nonmoving party will bear the burden of persuasion at trial, the moving party may satisfy its burden of production by either (1)

---

[28] FED. R. CIV. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).
[29] *DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005).
[30] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000).
[31] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
[32] *Smith v. Amedisys, Inc.*, 298 F.3d 434, 440 (5th Cir. 2002).
[33] *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263–64 (5th Cir. 1991) (quoting *Golden Rule Ins. Co. v. Lease*, 755 F. Supp. 948, 951 (D. Colo. 1991)).
[34] *Celotex*, 477 U.S. at 322–24.

submitting affirmative evidence that negates an essential element of the nonmovant's claim, or (2) demonstrating there is no evidence in the record to establish an essential element of the nonmovant's claim.[35] When proceeding under the first option, if the nonmoving party cannot muster sufficient evidence to dispute the movant's contention that there are no disputed facts, a trial would be useless, and the moving party is entitled to summary judgment as a matter of law.[36] When, however, the movant is proceeding under the second option and is seeking summary judgment on the ground that the nonmovant has no evidence to establish an essential element of the claim, the nonmoving party may defeat a motion for summary judgment by "calling the Court's attention to supporting evidence already in the record that was overlooked or ignored by the moving party."[37] Under either scenario, the burden then shifts back to the movant to demonstrate the inadequacy of the evidence relied upon by the nonmovant.[38] If the movant meets this burden, "the burden of production shifts [back again] to the nonmoving party, who must either (1) rehabilitate the evidence attacked in the moving party's papers, (2) produce additional evidence showing the existence of a genuine issue for trial as provided in Rule 56(e), or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f)."[39] "Summary judgment should be granted if the nonmoving party fails to

---

[35] *Id.* at 331–32 (Brennan, J., dissenting); *see also St. Amant v. Benoit*, 806 F.2d 1294, 1297 (5th Cir. 1987) (citing Justice Brennan's statement of the summary judgment standard in *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986), and requiring the movants to submit affirmative evidence to negate an essential element of the nonmovant's claim or, alternatively, demonstrate the nonmovant's evidence is insufficient to establish an essential element); *Fano v. O'Neill*, 806 F.2d 1262, 1266 (citing Justice Brennan's dissent in *Celotex*, and requiring the movant to make an affirmative presentation to negate the nonmovant's claims on summary judgment); 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE §2727.1 (2016) ("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case." (internal citations omitted)).
[36] *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288–89 (1980); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).
[37] *Celotex*, 477 U.S. at 332–33.
[38] *Id.*
[39] *Celotex*, 477 U.S. at 332–33, 333 n.3.

respond in one or more of these ways, or if, after the nonmoving party responds, the court determines that the moving party has met its ultimate burden of persuading the court that there is no genuine issue of material fact for trial."[40]

"[U]nsubstantiated assertions are not competent summary judgment evidence. The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports the claim. 'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'"[41]

## FACTS[42]

### I.    Undisputed Facts

The following facts are undisputed. In its third-party demand, Offshore seeks defense and indemnification from IOC for claims brought by Tyrone Felix against Offshore for bodily injury alleged to have been caused by Offshore.[43] To this end, Offshore's third-party demand seeks to enforce the January 1, 2014 MSC between Fieldwood (platform owner/operator) and IOC (Tyrone Felix's employer).[44]

Under the MSC, together with the work order applicable to the work of Tyrone Felix, IOC provided production operators to man Fieldwood offshore production platforms producing oil and/or gas in the West Delta 90 and 103 blocks, which work included, *inter alia*, controlling and/or monitoring wellheads and casing pressures on

---

[40] *Id.*; *see also First National Bank of Arizona*, 391 U.S. at 289.

[41] *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Celotex*, 477 U.S. at 324; *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) and quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)).

[42] The following facts are taken from IOC's statement of material facts and Offshore's response. *See* R. Doc. 65-6; *see also* R. Doc. 68-4. As reflected in this Order and Reasons and in the parties' briefing, there are additional undisputed facts beyond those stated in R. Doc. 65-6 and R. Doc. 68-4.

[43] *See* R. Doc. 65-6 at p. 1, ¶ 1; *see also* R. Doc. 68-4 at p. 1, ¶ 1 ("Uncontested, but [Offshore] also seeks additional insured coverage.").

[44] *See* R. Doc. 65-6 at p. 1, ¶ 2; *see also* R. Doc. 68-4 at p. 1, ¶ 2.

individual wells, conducting pressure tests, using test separators, checking for leaks on production equipment, and opening and closing wellheads and production valves.[45] Tyrone Felix was called out to work in the West Delta area of the Gulf of Mexico, which is located on the Outer Continental Shelf, off the coast of the State of Louisiana.[46] IOC did not expect the substantial use of a vessel to complete the MSC and work order.[47]

## II.    Disputed Facts

Offshore argues IOC's motion for summary judgment should be denied because there are disputed issues of material fact. First, IOC and Offshore dispute the extent to which the terms of the MSC and applicable work order contemplated additional work, beyond platform work, involving the use of a vessel. Under the terms of the MSC, IOC contends the contract contemplated a vessel only being used for marine transportation purposes.[48] In opposition, relying on Section 2(e) of the MSC, Offshore argues the terms of the MSC contemplated more than marine transportation.[49]

Second, IOC and Offshore dispute the extent to which the parties to the MSC and work order, Fieldwood and IOC, expected a vessel to be used in the completion of the contract. Relying on the deposition testimony of Fieldwood's corporate representative and a declaration of IOC's chief executive officer, IOC argues neither it nor Fieldwood expected a vessel to play a substantial role in the completion of the contract.[50] In opposition, Offshore argues Fieldwood expected a vessel to play a substantial role in the

---

[45] *See* R. Doc. 65-6 at p. 1, ¶ 3; *see also* R. Doc. 68-4 at pp. 1-2, ¶ 3 (conceding IOC's statement is accurate but "incomplete").

[46] *See* R. Doc. 65-6 at p. 2, ¶ 4; *see also* R. Doc. 68-4 at p. 2, ¶ 4.

[47] *See* R. Doc. 65-6 at p. 2, ¶ 5; *see also* R. Doc. 68-4 at p. 2, ¶ 5 (only offering evidence to dispute Fieldwood's expectation).

[48] *See* R. Doc. 65-6 at p. 2, ¶ 5. In its briefing, Offshore also suggests the MSC and work order contemplated work at Fieldwood's West Delta 75 platforms as well.

[49] R. Doc. 68-4 at p. 2, ¶ 5.

[50] *See* R. Doc. 65-6 at p. 2, ¶ 5.

completion of the contract on the basis of Fieldwood's corporate representative's deposition testimony.[51]

Third, IOC and Offshore dispute the extent to which a vessel was actually used to complete the work governed by the MSC and applicable work order. On the basis of Fieldwood's corporate representative's deposition testimony and a declaration by IOC's chief executive officer, IOC argues the completion of the work was solely on the platforms at issue.[52] In opposition, relying on the deposition testimony of Fieldwood's corporate representative and certain job safety analysis reports, Offshore argues the actual work performed also entailed offloading and backloading equipment from vessels and taking on potable water from vessels to platforms.[53]

## **LAW AND ANALYSIS**

IOC moves for summary judgment,[54] thereby asserting the indemnity, defense, and indemnity insurance coverage provisions in the MSC are null and void under the LOIA. At this juncture, the parties do not dispute that, should the provisions at issue be found enforceable, Offshore would be entitled to the relief it seeks in its third-party demand.[55] The only dispute is whether the provisions are enforceable. The answer to this question, as discussed below, turns on whether state law or federal maritime law applies. If state law applies, the LOIA bars enforcement of the indemnity provisions, assuming other statutory requirements are met, as discussed *infra*, but only bars Offshore's claim for defense costs if Offshore is found at fault after a trial on the merits. If federal maritime law applies, however, all the provisions are enforceable.

---

[51] R. Doc. 68-4 at p. 2, ¶ 5.
[52] *See* R. Doc. 65-6 at pp. 1-2, ¶¶ 3-5.
[53] R. Doc. 68-4 at pp. 1-2, ¶¶ 3-5.
[54] R. Doc. 65.
[55] Again, that is indemnification from the claims asserted by Felix and IOC's worker compensation carrier in the underlying limitation action, indemnity insurance coverage, and defense costs.

## I.     Louisiana law applies pursuant to the OCSLA.

To determine whether the indemnity provisions in the MSC are enforceable, the Court must first determine which law applies. The parties dispute whether the Outer Continental Shelf Lands Act ("OCSLA") choice-of-law analysis applies to this matter.[56] If the OCSLA's analysis does apply, it supersedes the normal choice-of-law rules that the forum would apply, and instead requires courts to apply the "civil and criminal laws of [the] adjacent state."[57] In this case, it is undisputed that the Fieldwood platforms at issue are anchored to the seabed off the coast of Louisiana,[58] meaning, if the OCSLA's analysis applies, Louisiana law governs the instant dispute because it is the state adjacent to Fieldwood's platforms.

Courts look to the three-part test formulated by the United States Supreme Court in *Rodrigue v. Aetna Cas. & Surety Co.*[59] to determine whether the OCSLA requires application of the adjacent state's law in the present matter. This test requires, "(1) The controversy must arise on a situs covered by the OCSLA (i.e. the subsoil seabed, or artificial structure permanently or temporarily attached thereto). (2) Federal maritime law must not apply of its own force. (3) The state law must not be inconsistent with federal law."[60] Only the second element is contested in this case.

---

[56] *Compare* R. Doc. 65-1 at pp. 3-6 *with* R. Doc. 68 at pp. 6-11.

[57] 43 U.S.C. § 1333(a)(2)(A). See *Snyder Oil Corp. v. Samedan Oil Corp.*, 208 F.3d 521, 522-23 (5th Cir. 2000).

[58] *See* R. Doc. 65-6 at p. 2, ¶ 4; *see also* R. Doc. 68-4 at p. 2, ¶ 4.

[59] 395 U.S. 352 (1969). *See also Union Texas Petroleum Corp. v. PLT Engineering, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990).

[60] *Rodrigue*, 395 U.S. at 359.

**A.   Element 1: The controversy must arise on a situs covered by the OCSLA.**

"When a case involves a contractual indemnity provision, the Fifth Circuit holds that 'a contractual indemnity claim (or any other contractual dispute) arises on an OCSLA situs if a majority of the performance called for under the contract is to be performed on stationary platforms or other OCSLA situses enumerated in 43 U.S.C. § 1333(a)(2)(A).'"[61] The parties do not contest that the controversy arose on a situs covered by the OCSLA.[62]

**B.   Element 2: Federal maritime law must not apply of its own force.**

The primary question before the Court is whether federal maritime law applies of its own force. The parties agree this depends on whether the "contracts at issue" are maritime contracts (requiring application of federal maritime law) or nonmaritime contracts (requiring application of Louisiana law pursuant to the OCSLA).[63]

At the outset, the Court clarifies what documents constitute the "contracts at issue." It is uncontested that the relevant contracts are the January 1, 2014 MSC between Fieldwood (platform owner/operator) and IOC (Felix's employer) *and* the applicable December 16, 2020 work order (collectively, "the Contract").[64] This accords with Fifth Circuit precedent, which suggests courts should consider not only general master agreements, but also more specific work orders or bids.[65] Courts look to both the MSC and work order because the MSC merely provides the framework or "rules of the game" for subsequent contracts if the contracting parties "decide to play ball" as reflected by later

---

[61] *Cardoso-Gonzales*, 326 F.Supp.3d 273, 280 (E.D. La. 2018) (citing *Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 787 (5th Cir. 2009)).
[62] R. Doc. 65-1 at p. 3; *see also* R. Doc. 68 at p. 6.
[63] R. Doc. 65-1 at p. 3; *see also* R. Doc. 68 at p. 6.
[64] *See* R. Doc. 65-6 at p. 1, ¶ 3; *see also* R. Doc. 68-4 at pp. 1-2, ¶ 3 (conceding IOC's statement is accurate but "incomplete"). *Paige v. Gulf Oil Corp.*, 775 F.2d 1311, 1315 (1985); *Matte v. Zapata Offshore Co.*, 784 F.2d 628, 630 (5th Cir. 1986). For brevity, the Court will refer to the MSC and work order collectively as "the Contract."
[65] *Crescent*, 896 F.3d at 360.

verbal or written work orders, which each party remains free to accept.[66] With this in mind, the Court now turns to the substance of the second element.

Offshore argues the second element of the OCSLA analysis cannot be met because the Contract is either a maritime contract or, at a minimum, genuine issues of material fact remain for trial on this point.[67] By contrast, IOC argues "it is evident that the Contract is not maritime in nature" and Offshore has failed to present a genuine dispute of material fact to prevent summary judgment.[68] As a result, the Court must determine whether there is a genuine dispute of material fact as to whether the Contract is maritime or nonmaritime.

In the context of a "contract for performance of specialty services to facilitate the drilling or production of oil or gas on navigable waters,"[69] as is the context here, the Fifth Circuit created a two-prong test to determine whether a contract is maritime in nature in *In re Larry Doiron, Inc.*:

> First, is the contract one to provide services to facilitate the drilling or production of oil and gas on navigable waters? . . . Second, if the answer to the above question is "yes," does the contract provide or do the parties expect that a vessel will play a substantial role in the completion of the contract? If so, the contract is maritime in nature.[70]

---

[66] *Phoenix International Holdings, Inc. v. UH Services Group, LLC*, 2021 WL 3021932 (E.D. La. 7/16/2021).

[67] R. Doc. 68 at p. 6.

[68] R. Doc. 65-1 at p. 5.

[69] *In re Larry Doiron, Inc.*, 879 F.3d 568, 569 (5th Cir. 2018) (en banc).

[70] *Id.* at 576. It is said "[o]nly if these questions do not resolve the maritime-nonmaritime issue, such as if the scope of the contract or the extent to which the parties expect vessels to be involved in the work remain unclear, may the Court examine the *Davis* factors." *Carr v. Yellowfin Marine Servs., LLC*, 423 F.Supp.3d 316, 321 (E.D. La. 2019) (Ashe, J.). Because the Fifth Circuit's two-part test resolves the maritime-nonmaritime issue, the Court cannot reach the *Davis* factors.

"An affirmative answer to both questions is necessary before the label 'maritime' may be applied to the contract."[71] "This test places the focus on the contract and the expectations of the parties."[72] The Court will answer each question in turn.

### i. Was this a contract to provide services to facilitate the drilling or production of oil and gas on navigable waters?

The parties agree that the Contract was "one to provide services to facilitate the drilling or production of oil and gas on navigable waters."[73] Accordingly, the Court will answer the first question in the affirmative and move to answering the second question.

### ii. Does the contract provide or do the parties expect that a vessel will play a substantial role in the completion of the contract?

In its motion for summary judgment, IOC contends Offshore has no evidence to establish the Contract provided for, or the parties expected, a vessel to play a substantial role in the completion of the Contract.[74] In support, IOC points to evidence that the parties did not expect a vessel to play a substantial role in the completion of the Contract and that the actual work performed did not involve substantial use of a vessel.[75] In opposition, Offshore argues genuine disputes of material fact exist as to whether the second prong of the *Doiron* test is satisfied because (1) "the MSC contemplates Fieldwood's contracting with third parties for marine transportation to or from the worksite;"[76] (2) Fieldwood's corporate representative testified work from a vessel is part of the "agreement;"[77] and (3) some vessel-related work was performed.[78]

---

[71] *In re Crescent Energy Services, L.L.C.*, 896 F.3d 350, 355 (5th Cir. 2018).

[72] *In re Larry Doiron, Inc.*, 879 F.3d at 576.

[73] R. Doc. 65-1 at p. 6 ("Here, the Contract provides for [IOC] to supply production personnel to produce oil and gas on fixed platforms."); *see also* R. Doc. 68 at p. 7 ("Here, it cannot be disputed that the . . . first prong of the *Doiron* test is met.").

[74] R. Doc. 65-1 at p. 5.

[75] *See* R. Doc. 65-6 at p. 2, ¶ 5.

[76] R. Doc. 68 at p. 6.

[77] *Id.* at p. 10.

[78] *Id.* at pp. 7-9.

The Fifth Circuit's *Doiron* test "places the focus on the contract and the expectations of the parties."[79] "We must remember that the contracting parties' expectations are central."[80] "Even significant vessel involvement isn't enough if that involvement was" not expected by the parties.[81] However, where "[t]he scope of the contract [is] unclear; [or] the extent to which the parties expect vessels to be involved in the work [is] unclear . . . courts may permit the parties to produce evidence of the work actually performed and the extent of vessel involvement in the job."[82]

"Among the directions given by *Doiron* on what 'substantial' means is that if [the contracted for] 'work is performed in part on a vessel and in part on a platform or on land, we should consider not only time spent on the vessel but also the relative importance and value of the vessel-based work to completing the contract."[83] The Fifth Circuit has clarified that the role of a vessel as transportation to and from the job site is irrelevant in this analysis.[84] Additionally, the fact that the claimant, Mr. Felix, allegedly was injured while aboard the vessel is not dispositive. To that point, in *Doiron*, the Fifth Circuit wrote "[t]he facts surrounding the accident are relevant to whether the worker was injured in a maritime tort, but they are immaterial in determining whether the worker's employer entered into a maritime contract."[85] Indeed, after *Doiron*, "[w]e are no longer concerned about whether the worker was on a platform or vessel" when injured.[86]

Here, it is undisputed that the MSC and applicable work order reflect a contractual relationship between Fieldwood and IOC whereby IOC was to provide operators to work

---

[79] *In re Larry Doiron, Inc.*, 879 F.3d 568, 576 (5th Cir. 2018) (en banc).
[80] *In re Crescent Energy Servs., L.L.C.*, 896 F.3d 350, 359-60 (5th Cir. 2018).
[81] *Barrios v. Centaur, LLC*, 942 F.3d 670, 681 (5th Cir. 2019) (citation omitted).
[82] *Doiron*, 879 F.3d at 577; *accord Carr v. Yellowfin Marine Servs., LLC*, 423 F.Supp.3d 316, 321 (E.D. La. 2019) (Ashe, J.).
[83] *Crescent*, 896 F.3d at 359 (quoting *Doiron*, 879 F.3d at 576 n.47).
[84] *Id.*
[85] *Doiron*, 879 F.3d at 573-74.
[86] *Crescent*, 896 F.3d at 356-57.

on Fieldwood's oil and gas production platforms.[87] It also is undisputed that the work

order at issue is a December 16, 2020 email chain between IOC and Fieldwood whereby

Fieldwood asked IOC for additional workers to fill "A op spot[s]."[88] The work order does

not itself specify the type of work to be performed by IOC's workers.[89] It is undisputed

that the MSC and applicable work order, taken together, called for IOC to provide

production operators to man Fieldwood's production platforms producing oil and/or gas

at the West Delta 90 and 103 blocks.[90] The parties agree three platforms are located in the

West Delta 90 block that are attached by bridges and the West Delta 103 block contains

one satellite platform.[91]

In light of the Fifth Circuit's framework, the Court considers whether, together, the

MSC and work order email "provide[d] or [] the parties expect[ed] that a vessel [would]

play a substantial role in the completion of the contract."[92] Starting with the work order,

it clearly makes no mention of a vessel, so the work order does not create a question of

fact preventing summary judgment.[93] With respect to the MSC, Offshore argues only one

provision of the MSC contemplates the use of a vessel in the completion of the contract.[94]

That provision provides as follows:

> Whenever Work to be performed under this Contract involves worksites located
> offshore within inland water, Company, unless otherwise agreed to in writing, shall
> have the obligation to provide marine transportation for equipment and works in
> association with such Work, and may enter into agreements with third parties for
> the provision of marine transportation services. Company and contractor

---

[87] *See* R. Doc. 65-6 at p. 1, ¶ 3; *see also* R. Doc. 68-4 at pp. 1-1, ¶ 3 (conceding IOC's statement is accurate but "incomplete" with respect to actual work performed).

[88] *See* R. Doc. 65-6 at p. 1, ¶ 3; *see also* R. Doc. 68-4 at pp. 1-1, ¶ 3.

[89] R. Doc. 65-3 at pp. 1-4.

[90] *See* R. Doc. 65-6 at p. 1, ¶ 3; *see also* R. Doc. 68-4 at pp. 1-1, ¶ 3 (conceding IOC's statement is accurate but "incomplete" with respect to actual work performed).

[91] *Compare* R. Doc. 65-1 at p. 3 *with* R. Doc. 68 at p. 13; *see also* R. Doc. 65-2 at p. 8 (testimony of Fieldwood's corporate representative); *see also* R. Doc. 68-1 at p. 89 (zoomed in photographs of the West Delta 75, 103, 90, and 79 blocks).

[92] *Doiron*, 879 F.3d at 576.

[93] R. Doc. 65-3 at pp. 1-4.

[94] R. Doc. R. Doc. 68 at pp. 7, 10.

specifically agree that such transportation, whether provided by Company or Contractor, is a maritime activity and shall be subject to General Maritime Law of the United States of America at all times while any member or Contractor Group (as defined herein) is being transported to or from the worksite, including, without limitation, while such member is embarking or disembarking or while such equipment is being loaded or offloaded from any vessel(s).[95]

This provision of the MSC clearly contemplates work performed may "involve[] worksites located offshore or within inland waters" and that, when that is the case, Fieldwood will "provide marine transportation."[96] Beyond this provision, the MSC does not contemplate the use of vessels.[97] As discussed above, the use of a vessel as transportation to a worksite is not relevant to the *Doiron* analysis as a matter of law.[98] To the extent Offshore argues the "loading and offloading" of items transported on vessels makes the use of those vessels substantial, and the Contract a maritime one, the Court disagrees. Marine transportation, which is a maritime activity,[99] must be ignored in the *Doiron* analysis. The Court concludes that loading and offloading items, called for under the MSC as part of the transportation process, must be ignored as well—even though loading and unloading also is a maritime activity.[100] In fact, a section of the U.S. District Court for the Southern District of Texas, considering an identical provision of a master services contract, found, *inter alia*, use of vessels to load and offload equipment as part of the transportation process "concerns transportation" and, thus, is not considered in the *Doiron* analysis under Fifth Circuit precedent.[101] This finding comports with decisions from two different sections of this court; Judges Ashe and Africk faced with an identical

---

[95] R. Doc. 38-1 at p. 2.
[96] *Id.*
[97] *Id.*
[98] *Crescent*, 896 F.3d at 359.
[99] *West of England Shipowners Mut. P&I Ass'n v. Shell Offshore, Inc.*, 1994 WL 500952, at *3-4 (E.D. La. 9/8/1994) (McNamara, J.).
[100] *Hertz v. Treasure Chest Casino, LLC*, 24 F.Supp.2d 795, 802 (E.D. La. 2003).
[101] *Fleet Operators, Inc. v. Nautilus Ins. Co.*, CV 19-313, R. Doc. 57 at pp. 18-20 (S.D. Tx. 8/3/2021) (Brown, J.).

provision of a master services contract involving a Fieldwood platform held those contracts "did not provide that a vessel would play a substantial role in the completion of the contract."[102] As a result, taking the MSC and applicable work order together, the Court finds there is no genuine dispute of material fact that the Contract plainly did not provide a vessel would play a substantial role in its completion.

The Court next considers whether the parties expected a vessel to play a substantial role in the completion of the Contract. The Fifth Circuit has made clear the contracting parties' expectations should guide this analysis.[103] IOC argues there is no genuine dispute of material fact that the contracting parties, IOC and Fieldwood, did not contemplate a vessel would play a substantial role in the completion of the Contract.[104] In terms of evidence, IOC points to the declaration of Gregg Falgout, IOC's president and chief executive officer, and the deposition of Fieldwood's corporate representative.[105] Gregg Falgout is the president and chief executive officer of IOC.[106] In his declaration, Mr. Falgout states that "IOC production operators . . . performed no work upon . . . vessels."[107] Instead, the parties only expected the use of vessels "as a means of transportation to relocate production workers as necessary among the field platforms and/or to transport them back to shore."[108] The declaration further states "[n]either IOC nor Fieldwood," the two parties to the Contract, "had any expectation of vessels being used as work platforms

---

[102] *In the Matter of Aries Marine Corporation, et al.*, Civ. A. 19-10850, R. Doc. 241 at p. 13 (E.D. La. 2/3/2023) (Africk, J.); *Carr v. Yellowfin Marine Servs.*, LLC, 423 F.Supp.3d 316, 323 (E.D. La. 10/30/2019) (Ashe, J.) (R. Doc. 26-4 at p.2 in 18-4093 provides an identical provision of the MSC); *see also QuarterNorth Energy, LLC v. Supreme Offshore Servs., Inc.*, 2023 WL 1927364, at *5-6 (E.D. La. 2/10/2023) (dealing with "an agreement to provide both dockage *and* services [of] loading an unloading cargo for various vessels," including "dockage, riggers, foremen, cranes, and forklifts for multiple vessels," which is not analogous to the case at bar).
[103] *Crescent*, 896 F.3d at 359-60.
[104] R. Doc. 65-1 at p. 5.
[105] *Id.* at p. 5 n.26.
[106] *See* R. Doc. 65-4 at p. 1, ¶ 2.
[107] *Id.* at p. 2, ¶ 11.
[108] *Id.*

16

by IOC personnel for any work performed or contemplated."[109] Indeed, it is undisputed that IOC did not expect a vessel to play a substantial role in the completion of the Contract.[110]

In opposition, Offshore points to a different part of the Fieldwood corporate representative's deposition testimony, which, Offshore argues, creates a genuine dispute of material fact as to whether Fieldwood contemplated a vessel playing a substantial role in the completion of the Contract.[111] The Fieldwood deposition testimony Offshore points to reads as follows:

> Q. Was it contemplated that Mr. Felix, as an A operator, would be performing any work from a vessel?
> A. [non-responsive answer]
> Q. Okay. And I don't mean transportation to and from a satellite, from a platform to a platform. I mean actual work performed from a vessel. Would that be contemplated under the Operators roles and responsibilities?
> A. What do you mean by "work from a vessel?"
> Q. So for instance if they would be using any kind of equipment connected by lines that may be connected to a vessel?
> A. We typically don't do that, but it is part – it has been done, yes, sir. I'd say it's part of the agreement.[112]

To the extent this testimony is evidence that Fieldwood expected a vessel to play some role in the completion of the Contract, this testimony alone is not sufficient to defeat summary judgment. Courts have held the Fifth Circuit's "expectations of the parties" standard requires there to be a *shared expectation* that a vessel would play a substantial role.

For example, in *In the Matter of Aries Marine Corporation, et al.*, a different section of this court decided whether to apply federal maritime law or Louisiana law to a

---

[109] *Id.*
[110] *See* R. Doc. 65-6 at p. 2, ¶ 5; *see also* R. Doc. 6804 at p. 2, ¶ 5 (only offering evidence to dispute Fieldwood's expectation).
[111] R. Doc. 68 at pp. 9-10.
[112] R. Doc. 68-1 at p. 15.

master services contract that included an indemnity provision like the one in the case at bar.[113] In analyzing whether the contracting parties expected a vessel to play a substantial role in the completion of the contract, the court found "[t]here [wa]s sufficient evidence to conclude that [two of the contracting parties] expected the vessel to play a substantial role in the completion of the contract."[114] Nevertheless, there was "no evidence that [the other contracting parties] shared that expectation."[115] The court, relying on *Doiron*, found the contracting parties, collectively, must have a shared expectation "that the vessel would play a substantial role."[116] The Court finds the reasoning of *Aries Marine* highly persuasive.

Applying *Aries Marine* to the case at bar, even if Fieldwood expected a vessel to play a substantial role in the completion of the Contract, there is no genuine dispute of material fact that IOC did not share such an expectation. It is undisputed that IOC did not expect a vessel to play a substantial role in the completion of the Contract.[117] Said differently, the summary judgment record establishes there was no shared expectation that a vessel would play a substantial role in the completion of the Contract.

Offshore's focus on the actual work performed involving a vessel flies in the face of the Fifth Circuit's instruction to focus on the parties' expectations. "Th[e] [*Doiron*] test places the focus on the contract and the expectations of the parties. This is the proper approach in a contract case and assists the parties in evaluating their risks, particularly their liability under indemnification clauses in the contract."[118] Though it is true the Fifth

---

[113] *In the Matter of Aries Marine Corporation, et al.*, Civ. A. 19-10850, R. Doc. 241 at p. 1 (E.D. La. 2/3/2023) (Africk, J.).
[114] *Id.* at p. 14.
[115] *Id.*
[116] *Id.* at pp. 14, 16.
[117] *See* R. Doc. 65-6 at p. 2, ¶ 5; *see also* R. Doc. 6804 at p. 2, ¶ 5 (only offering evidence to dispute Fieldwood's expectation).
[118] *In re Larry Doiroin, Inc.*, 879 F.3d 568, 576 (5th Cir. 2018).

Circuit in *Doiron* stated, when the parties' expectations are unclear, courts may rely on evidence of the actual use of the vessel in determining whether a contract is maritime or nonmaritime,[119] the instant matter does not present a problem of clarity. Because it is undisputed that IOC did not expect the vessel to play a substantial role in the completion of the work, the Court finds it unnecessary to examine the extent to which the vessel was used during the work.[120] For the foregoing reasons, the Court concludes that the Contract at issue here fails the second prong of the *Doiron* test and therefore is nonmaritime.

In sum, maritime law does not apply of its own force to the indemnity provisions because the Contract is nonmaritime. Thus, the second element of the OCSLA choice-of-law analysis is satisfied.

## C.  Element 3: That state law must not be inconsistent with federal law.

The parties do not argue the LOIA is inconsistent with federal law.[121] Indeed, the Fifth Circuit has consistently held the LOIA does not conflict with federal law.[122] Accordingly, the third element is met. The Court finds the OCSLA applies in this case. Notwithstanding the OCSLA, the Court still must consider whether the choice-of-law provision in the MSC overrides any other legal basis for determining the applicable law.[123]

In this case, the MSC calls for the application of federal maritime law or, in the alternative, Texas state law.[124] Both federal and Louisiana state courts routinely disregard choice-of-law provisions in master service contracts when the OCSLA requires the

---

[119] *Id.* at 577.

[120] Even if the Court were to reach the extent to which a vessel was actually used in the completion of the Contract, the summary judgment record establishes that role was either limited to transportation or otherwise incidental to the contract, meaning it cannot be "substantial" as a matter of law. *Carr v. Yellowfin Marine Servs., LLC*, 423 F.Supp.3d 316, 323 (E.D. La. 10/30/2019) (Ashe, J.).

[121] *See* R. Doc. 65-1; *see also* R. Doc. 68.

[122] *See Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 789 (5th Cir. 2009).

[123] *See Duet v. Falgout Offshore, LLC*, 757 F. Supp. 2d 598 (E.D. La. 2010).

[124] R. Doc. 38-1 at p. 13, ¶ 26.

application of the adjacent state's law.[125] In *Matte v. Zapata Offshore Co.*, for example, the Fifth Circuit addressed whether a choice-of-law provision that selected general maritime law trumped the application of the OCSLA.[126] The court held the choice-of-law provision "violates the public policy of both Louisiana and the United States," and voided the provision.[127] In this case, the Court similarly finds that the choice-of-law provision in the MSC is void because its conflicts with the application of the OCSLA and the LOIA.[128]

Accordingly, the Court shall disregard the choice-of-law provision in the MSC and apply Louisiana law pursuant to the OCSLA. The Court will now consider whether there are genuine disputes of material fact preventing this Court's application of the LOIA, a creature of Louisiana state law, to Offshore's claims against IOC.

## II.   The LOIA precludes Offshore's entitlement to the indemnity sought in its third-party demand against IOC.

IOC moves for summary judgment on the claims for indemnity asserted against it in Offshore's third-party demand. IOC argues the Louisiana Oilfield Indemnity Act bars the relief sought by Offshore. The LOIA was enacted after an express legislative finding "that an inequity is foisted upon certain contractors and their employees by the defense or indemnity provisions . . . contained in some agreements pertaining to wells for oil, gas or water."[129] As a result, the LOIA "declare[s] null and void and against public policy . . . any provision in any agreement which requires defense and/or indemnification, for death or bodily injury to persons, where there is negligence or fault (strict liability) on the part

---

[125] *Roberts v. Energy Dev. Corp.*, 235 F.3d 935, 943 (5th Cir. 2000); *Matte v. Zapata Offshore Co.*, 784 F.2d 628 (5th Cir. 1986); *Silverman v. Mike Rogers Drilling Co., Inc.*, 34 So.3d 1099, 1104 (La. App. 2 Cir. 4/14/10).

[126] 784 F.2d 628 (5th Cir. 1986).

[127] *Id.* at 631-32.

[128] *Carodoso-Gonzales v. Anadarko Petroleum Corp.*, 326 F.Supp.3d 273, 281 (E.D. La. 6/20/2018) (Morgan, J.) (reaching the same conclusion).

[129] La. Rev. Stat. 9:2780.

of the indemnitee . . . ."[130] The "LOIA is 'broadly written and has been broadly interpreted by Louisiana courts and the Fifth Circuit.'"[131] Accordingly, to determine whether the provisions of the LOIA apply to a given contract, the Fifth Circuit fashioned a two-part inquiry in *Transcontinental Gas Pipe Line Corp. v. Transp. Ins. Co*:

> First, there must be an agreement that "pertains to" an oil, gas or water well. If the contract does not pertain to a well, the inquiry ends. Only if we determine that the contract has the required nexus to a well may we proceed to the second step of the process, examination of the contract's involvement with "operations related to the exploration, development, production, or transportation of oil, gas, or water" . . . Therefore, if (but only if) the agreement (1) pertains to a well and (2) is related to exploration, development, production, or transportation of oil, gas, or water, will the Act invalidate any indemnity provision contained in or collateral to that agreement. [132]

In applying the Fifth Circuit's analytical framework, the particular job that resulted in the injury is irrelevant. Whether the LOIA applies should be considered in relation to the nature of the contract, rather than the task or activity that led to the incident.[133] As a result, the activities giving rise to the claim need not have been rendered at the offshore site or in connection with the drilling or operation of a particular site in order to fall within the bounds of the LOIA.[134]

Further, the Fifth Circuit has held the relevant contract in the LOIA context is the applicable work order.[135] Again, it is undisputed that the work order at issue is a December 16, 2020 email chain between IOC and Fieldwood whereby Fieldwood asked for

---

[130] LA. REV. STAT. § 9:2780(A).
[131] *Fleet Operators, Inc. v. Nautilus Insurance Co.*, 2022 WL 5405892, at *2 (S.D. Tex. 7/18/2022) (internal quotations and alterations omitted).
[132] *Transcon. Gas Pipe Line Corp. v. Transp. Ins. Co.*, 953 F.2d 985, 991 (5th Cir. 1992); *Fontenot v. Chevron U.S.A. Inc.*, 95-1425 (La. 7/02/96); 676 So. 2d 557, 564.
[133] *Grand Isle Shipyard v. Gray Insurance Co.*, 589 F.3d 778 (5th Cir. 2009); *Hodgen v. Forest Oil Corp.*, 115 F.3d 358 (5th Cir. 1997).
[134] *See Grand Isle Shipyard* at 787 (5th Cir. 2009).
[135] *See Roberts v. Energy Devel. Corp.*, 104 F.3d 782, 784 (5th Cir. 1997).

additional IOC workers to fill "A op spot[s]."[136] By Offshore's own telling, under the work order, Felix (the injured worker) was called out to work as an "A Operator" in Fieldwood's West Delta field, including at the West Delta 90 A, B, and E platforms (these three platforms being connected by bridges/catwalks) and the West Delta 103 F platforms.[137] It is undisputed that A Operators work included, *inter alia*, controlling and/or monitoring wellheads and casing pressures on individual wells, conducting pressure tests, utilizing test separators, checking for leaks on production equipment, and opening and closing wellheads and production valves.[138]

Turning to the Fifth Circuit's two-party inquiry, IOC and Offshore agree the second prong of the LOIA analysis is satisfied—the subject matter of the work order is related to exploration, development, production, or transportation of oil, gas, or water. However, Offshore argues there is a genuine issue of material fact as to whether the work at issue here "pertains to a well,"[139] *i.e.*, the first prong of the analysis.

The determination of "whether a contract pertains to a well . . . requires a fact intensive case-by-case analysis."[140] This is because "[t]he Fifth Circuit has recognized that there is a point at which the subject of a contract no longer pertains to a well. Th[is] point is reached when the work relates to [oil or] gas that 'can no longer be identified with a particular well or if the [oil or] gas becomes so fundamentally changed by processing, commingling, or preparing it for distribution to its ultimate end user that it can no longer properly be attributed to a particular well."[141] The parties agree the applicable work order

---

[136] *See* R. Doc. 65-6 at p. 1, ¶ 3; *see also* R. Doc. 68-4 at pp. 1-2, ¶ 3 (conceding IOC's statement is accurate but "incomplete" with respect to actual work performed); R. Doc. 65-3 at pp. 1-4 (the work order).
[137] R. Doc. 68 at p. 4.
[138] *See* R. Doc. 65-6 at p. 1, ¶ 3; *see also* R. Doc. 68-4 at pp. 1-2, ¶ 3 (conceding IOC's statement is accurate but "incomplete").
[139] R. Doc. 68 at p. 11.
[140] *Transco*, 953 F.2d at 994.
[141] *Labove v. Candy Fleet, LLC*, 2012 WL 3043168, at *3 (E.D. La. July 20, 2012) (Africk, J.) (quoting *Johnson v. Amoco Prod. Co.*, 5 F.3d 949, 953–54 (5th Cir. 1993)).

called for production operators to work on equipment that contained oil or gas that was commingled with oil or gas from wells located at either the West Delta 90 platforms and/or the West Delta 103 F platform.[142] Precisely to resolve this "commingled oil or gas" conundrum, in *Transcontinental*, the Fifth Circuit identified several factors that may be relevant to determining the point at which a contract for services does or does not pertain to a well. These factors are:

> (1) whether the structures or facilities to which the contract applies or with which it is associated are part of an in-field gas gathering system; (2) the geographical location of the facility or system relative to the well or wells; (3) whether the structure in question is a pipeline or is closely involved with a pipeline; (4) if so, whether that line picks up gas from a single well or a single production platform or instead carries commingled gas originating from different wells or production facilities; (5) whether the pipeline is a main transmission or trunk line; (6) the location of the facility or structure relative to compressors, regulating stations, processing facilities or the like; (7) the purpose or function of the facility or structure in question; (8) what, if any, facilities or processes intervene between the wellhead and the structure or facility in question; (9) who owns and operates the facility or structure in question, and who owns and operates the well or wells that produce the gas in question; and (10) any number of other details affecting the functional and geographic nexus between "a well" and the structure or facility that is the object of the agreement under scrutiny.[143]

"Factors three, four, five, six, and eight are *only* relevant when the services provided for in the contract under scrutiny are related to natural gas transmission systems,"[144] like the one in *Transcontinental*. "Courts have applied [a] modified five-factor *Transcontinental*

---

[142] *See* R. Doc. 72 at p. 7 (IOC conceding this point); *see also* R. Doc. 68 at p. 13 (Offshore making this point). In opposition, Offshore presents a declaration of James Philip Amy, who confirms the hydrocarbons at the relevant platforms were commingled at various points. *See* R. Doc. 68-3. In reply, IOC asks the Court to strike Amy's declaration because Offshore "failed to disclose this witness until after [IOC] filed its Motion and well after the Limited Discovery period concluded." R. Doc. 72. The Court will not strike the declaration because IOC concedes the commingling issue.

[143] *Labove v. Candy Fleet, LLC*, No. 11-1405, 2012 WL 3043168, at *3-4 (E.D. La. July 20, 2012) (Africk, J.).

[144] Katherine Fruge Corry, *Removing the Risk from Risk Allocation: Reforming Louisiana's Oilfield Anti-Indemnity Act,* 81 LA. L. REV. 1038, 1048-49 n.89 (2021) (emphasis added); *Broussard v. Conoco, Inc.*, 959 F.2d 42, 44-45 (5th Cir. 1992); *Simar v. Tetra Techs. Inc.*, 2017 WL 4274348, at *12 (W.D. La. Sept. 26, 2017); *Fleet Operators, Inc. v. Nautilus Ins. Co.*, 2022 WL 5405892, at *4 (S.D. Tex. July 18, 2022).

test in cases involving oil and gas platforms and related structures."[145] IOC has presented uncontroverted summary judgment evidence that "the platforms [at issue] . . . are production platforms,"[146] and not related to "gas transmission platforms."[147] Accordingly, the Court will consider only the following *Transcontinental* factors:

> (1) whether the structures or facilities to which the contract applies or with which it is associated . . . are part of an in-field gas-gathering system; (2) what is the geographical location of the facility or system relative to the well or wells; . . . (7) what is the purpose or function of the facility or structure in question; . . . (9) who owns and operates the facility or structure in question, and who owns and operates the well or wells that produce the [oil or] gas in question; (10) and any number of other details affecting the functional and geographic nexus between "a well" and the structure or facility that is the object of the agreement under scrutiny.[148]

### A. Factor 1: Whether the structures or facilities to which the contract applies or with which it is associated are part of an in-field gas-gathering system.

"[T]he Fifth Circuit specifically lists 'production platforms' as one of the 'structures of facilities' to which the contract can apply or be associated with to satisfy this factor."[149] It is undisputed that the applicable work order called for IOC production operators to work on fixed oil and gas production platforms.[150] Specifically, it is undisputed that, under

---

[145] Corry, *supra* note 137 at 1048-49 n.89; *see also Howell v. Avante Servs., L.L.C.*, 2013 WL 1681436 (E.D. La. 4/17/2013) (Vance, J.).

[146] Offshore also presents evidence establishing some processing is done at the production platforms. *See, e.g.*, R. Doc. 83 at p. 8. Processing was also done at the production platform at issue in *Fleet Operators*. *Fleet Operators*, 2022 WL 5405892, at *6. Thus, that processing was done at the production platforms does not frustrate this Court's finding that "the contract under scrutiny" is not "related to a natural gas transmission system."

[147] R. Doc. 65-1 at p. 9.

[148] In its application of the *Transcontinental* factors, Offshore attempts to muddy the plain language of those factors by repeatedly explaining the commingling process at the Fieldwood platforms, even when the relevant factors make no mention of commingling. Offshore cites nothing to support its interpretation or application of the relevant *Transcontinental* factors. The *Transcontinental* factors are designed to determine the point at which a contract calling for commingled oil and gas production no longer pertains to a well. Therefore, reading a "commingling element" into nearly every factor of the *Transcontinental* test, as Offshore suggests, would effectively render the factors meaningless as a court would start and stop the inquiry with the fact of commingling. There is no dispute that there was commingling done at the facilities. Beating the "commingling drum," however loudly or repeatedly, does not change the facts or create applicable law.

[149] *Fleet Operators, Inc.*, 2022 WL 5405892, at *4 (S.D. Tex. 7/18/2022).

[150] *See* R. Doc. 65-6 at p. 1, ¶ 3; *see also* R. Doc. 68-4 at pp. 1-2, ¶ 3 (conceding IOC's statement is accurate but "incomplete"). The fact that some "vessel-related work" may have been completed does not frustrate this Court's conclusion that the structures to which the work order applied are part of an in-field gas-

the work order, IOC provided production operators to man Fieldwood offshore production platforms producing oil and/or gas at the West Delta 90 and 103 blocks, which work included controlling and/or monitoring wellheads and casing pressures on individual wells, conducting pressure tests, and opening and closing wellheads and production valves.[151]

Moreover, there is uncontroverted summary judgment evidence that shows Fieldwood's platforms are part of an in-field production system.[152] As courts have recognized, such a "conclusion is unremarkable: the very purpose of production platforms is, of course, to facilitate in-field production."[153] Accordingly, the Court concludes the structures to which the work order applies are part of an in-field gas-gathering system. This factor weighs in favor of applying the LOIA.

### B. Factor 2: What is the geographical location of the facility or system relative to the well or wells?

It is undisputed that the relevant Fieldwood platforms under the work order include three platforms located in the West Delta 90 Field (West Delta 90 A, B, and E) and the West Delta 103 F platform.[154] It is further undisputed that the relevant Fieldwood platforms are permanently attached to the seabed on the outer continental shelf adjacent to the coast of the State of Louisiana.[155]

---

gathering system. This is because whether the LOIA applies should be considered in relation to the contract. *See Grand Isle Shipyard v. Gray Insurance Co.*, 589 F.3d 778 (5th Cir. 2009).

[151] *See* R. Doc. 65-6 at p. 1, ¶ 3; *see also* R. Doc. 68-4 at pp. 1-2, ¶ 3 (conceding IOC's statement is accurate but "incomplete").

[152] R. Doc. 65-2 at p. 44.

[153] *Fleet Operators, Inc.*, 2022 WL 5405892, at *5 n.3.

[154] *See* R. Doc. 65-6 at p. 1, ¶ 3; *see also* R. Doc. 68-4 at pp. 1-2, ¶ 3 (conceding IOC's statement is accurate but "incomplete"). In its briefing, Offshore suggests the injured worker also worked at the West Delta 75 satellite platforms. *See* R. Doc. 83 at p. 5. The veracity of that statement is not material because it is sufficient for the contract to pertain "to any well." "The court . . . need [not] . . . look further to see if the contract pertained to any other wells." *See Lloyds of London v. Transcontinental Gas Pipe Line Corp.*, 38 F.3d 193, 197 (5th Cir. 1994).

[155] *See* R. Doc. 65-6 at p. 2, ¶ 4; *see also* R. Doc. 68-4 at p. 2, ¶ 4.

When the contract at issue pertains to multiple platforms, the Fifth Circuit has instructed it is sufficient to look to only one platform to determine whether the subject matter of the contract "pertains to a well."[156]

> The court . . . need [not] . . . look further to see if the contract pertained to any other wells. [Fifth Circuit caselaw] instructs us to examine the facts to see if the contract envisioned work which pertained to *any* well. The fact that the contract also may pertain to numerous other wells or to objects other than wells is of no consequence.[157]

In this case, Offshore has presented uncontroverted summary judgment evidence establishing the West Delta 90B platform, for example, was associated with wells 17, 24, and 26.[158] Fieldwood's corporate representative testified the surface location of these wells are physically located at the West Delta 90B platform.[159] This geographical nexus between platform and well makes it more likely that the contract pertains to a well.[160]

## C. Factor 7: What is the purpose or function of the facility or structure in question?

As numerous courts have recognized, there is no doubt that the purpose of a production platform "is to further drilling for oil and gas."[161] As Offshore itself concedes in its opposition, IOC workers performed services on Fieldwood's platforms to facilitate the drilling or production of oil and gas.[162] Ample uncontroverted summary judgment evidence establishes the same.[163] This factor weighs in favor of applying the LOIA.

---

[156] *Transcontinental Gas Pipe Line Corp.*, 38 F.3d at 197.
[157] *Id.*
[158] *See* R. Doc. 68-1 at p. 90.
[159] *See* R. Doc. 65-2 at pp. 32-33.
[160] *Cf. Hughes v. Pogo Producing Co.*, No. CIV.A. 06-1894, 2009 WL 667186, at *7 n.8 (W.D. La. Mar. 11, 2009) (holding the LOIA did not apply where there was "evidence there were no active production wells within five miles of the Grand Isle 115 platform," but noting that if a well had been nearby, "perhaps the analysis would be different and more akin to *Broussard*").
[161] *See, e.g.*, *Thibodeaux*, 370 F.3d at 494 ("purpose" of production platform "is to further drilling for oil and gas"); *Teaver*, 2012 WL 5866042, at *5 (production platform's "purpose was to assist in oil and gas production"); *DeHart*, 2010 WL 231744, at *1 (production platform "was ... erected for the purpose of oil and gas exploration, production and development").
[162] R. Doc. 68 at p. 7.
[163] R. Doc. 65-2 at pp. 44-45; *see also* R. Doc. 65-4.

### D. *Factor 9: Who owns and operates the facility or structure in question? Who owns the wells?*

It is undisputed that Fieldwood, an oil-and-gas exploration and production company and a party to the MSC and applicable work order, owns and operates the platforms at issue.[164] Further, IOC has presented uncontroverted summary judgment evidence that Fieldwood was an owner of the wells at issue.[165] Accordingly, the fourth factor weighs in favor of applying the LOIA.[166]

### E. *Factor 10: Any number of other details affecting the functional and geographic nexus between "a well" and the structure or facility that is the object of the agreement under scrutiny.*

Buttressing this Court's finding that the first four relevant *Transcontinental* factors point inexorably to the conclusion that "the agreement . . . pertains to a well," is the case of *In the Matter of Aries Marine Corporation, et al.*[167] In that case, Judge Africk determined the subject matter of an agreement pertained to a well when a Fieldwood-owned platform was "directly connected" to wells and where there was evidence establishing the oil and gas produced from that Fieldwood platform could be traced back to a particular well with which the platform was associated even as the oil and gas travelled through pipelines.[168] In this case, there is evidence, for example, that the West Delta 90B platform is associated with wells 17, 24, and 26,[169] and the surface locations of

---

[164] *See* R. Doc. 65-6 at p. 1, ¶ 3; *see also* R. Doc. 68-4 at pp. 1-2, ¶ 3 (conceding IOC's statement is accurate but "incomplete"); *see also* R. Doc. 30 at p. 3, ¶ 6 (Offshore's third-party demand); *see also* R. Doc. 83 at p. 10.

[165] *See, e.g.*, R. Doc. 65-2 at p. 45.

[166] *See Cardoso-Gonzalez*, 326 F. Supp. 3d at 277, 281–82 (holding the LOIA applied where owner and operator of platform was party to master service contract under which indemnity was sought); *Simar v. Tetra Techs., Inc.*, No. CV 15-01950, 2017 WL 4274348, at *1, 13 (W.D. La. Sept. 26, 2017) (holding the LOIA applied where owner and operator of platform was party to master service agreement under which indemnity was sought).

[167] *In the Matter of Aries Marine Corporation, et al.*, Civ. A. 19-10850, R. Doc. 241 at p. 1 (E.D. La. 2/3/2023) (Africk, J.).

[168] *Id.* at p. 19.

[169] *See* R. Doc. 68-1 at p. 90.

these wells are physically located at the platform.[170]  Furthermore, Fieldwood's corporate representative testified it is possible "to determine what specific wells the oil came from" after the oil is produced from the relevant platforms while it is being transported through oil pipelines.[171] As was the case in *Aries*, this evidence provides "other details affecting the functional and geographic nexus" and "suggests that the oil and gas produced *can* be properly attributed to a particular well."[172] For these reasons, the Court concludes there is no genuine dispute of material fact as to whether the LOIA applies; all five relevant *Transcontinental* factors point in favor of its application.

### F.  Application of the LOIA.

To recap, there is no genuine dispute of material fact that the MSC and applicable work order are nonmaritime contracts, meaning Louisiana law applies pursuant to the OSCLA. Because there also is no genuine dispute of material fact that the subject matter of the work order pertains to a well and is related to exploration, development, production, or transportation of oil, gas, or water, the LOIA applies. As a matter of law, the LOIA precludes Offshore's entitlement to the indemnity sought in its third-party demand against IOC;[173] that is, indemnity and insurance coverage[174] pursuant to the MSC.[175] "And when LOIA applies to an agreement, any purported obligations to indemnify

---

[170] *See* R. Doc. 65-2 at pp. 32-33.

[171] R. Doc. 68-1 at pp. 40-42.

[172] *Aries*, Civ. A. 19-10850, R. Doc. 241 at p. 19 (emphasis in original).

[173] R. Doc. 30.

[174] As this Court has recognized, the LOIA "expressly invalidates agreements requiring additional named insured endorsements or any other form of insurance protection which would frustrate or circumvent the prohibitions of" the Act. *See Carodoso-Gonzales v. Anadarko Petroleum Corp.*, 326 F.Supp.3d 273, 283 (E.D. La. 6/20/2018) (Morgan, J.) (internal quotations omitted). While the Fifth Circuit has recognized an exception to this rule when the additional named insured "actually pa[ys] for the cost of the insurance," there is no evidence before the Court suggesting Offshore paid for the cost of the insurance. *See Rogers v. Samedan Oil Corp.*, 308 F.3d 477, 481-82 (5th Cir. 2002).

[175] The Court denies IOC's Motion for Summary Judgment with respect to Offshore's claim for defense costs. *See infra* Part III.

are voided, and summary judgment is proper."[176] Accordingly, IOC is entitled to summary judgment on Offshore's indemnity claim and indemnity insurance claim against it.

### III.   The *Meloy* exception may apply, and the Court will not grant summary judgment on Offshore's claim for defense costs.

As a final matter, the Court will address Offshore's assertion that summary judgment is premature. In its opposition to IOC's motion,[177] Offshore contends that granting the motion for summary judgment would be premature based on the Louisiana Supreme Court's ruling in *Meloy v. Conoco*.[178] In that case, the Louisiana Supreme Court established an exception to the LOIA anti-indemnity rule that allows for the payment of defense costs when a potentially indemnified party is free from fault and the agreement provides for such an award.[179] Offshore argues that, as it may be entitled to recover attorneys' fees and costs from IOC if Offshore is found not to be at fault, the motion for summary judgment in its entirety is premature.

*Meloy* only serves as an exception to the LOIA's bar of claims for defense costs when the potential indemnitee is found free of fault after a trial.[180] The question of whether summary judgment as to an indemnity claim, as opposed to a claim for defense costs, may be granted under the LOIA before a trial on the merits was not before the Louisiana Supreme Court in *Meloy* as the indemnity claim already had been dismissed.[181] After all, once there is a trial in the instant case, either (1) Offshore will be assigned fault and cast in judgment, in which case the LOIA bars a claim for reimbursement of the monetary judgment claim (*i.e.*, the indemnity claim) and the costs of Offshore's defense (*i.e.,* the

---

[176] *Fleet Operators, Inc. v. Nautilus Ins. Co.*, 2022 WL 5405892, at *7 (S.D. Tex. 7/18/2022).
[177] R. Doc. 68.
[178] *Meloy v. Conoco*, 86-1466 (La. 4/16/1987), 504 So. 2d 833.
[179] *Id.* at 839.
[180] *Meloy v. Conoco*, 86-1466 (La. 4/16/1987), 504 So. 2d 833.
[181] *Id. See also Meloy v. Conoco*, 784 F.2d 1320, 1321-22 (5th Cir. 1986), *opinion withdrawn*, 792 F.2d 56 (5th Cir. 1986).

claim for defense costs); or (2) Offshore will be assigned no fault, in which case there would be no indemnity to recoup, but *Meloy* allows a limited exception for Offshore to seek defense costs from IOC. *Meloy* does not serve as a bar to summary judgment on indemnity claims. Accordingly, the Court grants IOC's Motion for Summary Judgment with respect to Offshore's indemnity and indemnity insurance coverage claims and denies the Motion for Summary Judgment with respect to Offshore's claim for defense costs.

## CONCLUSION

For the foregoing reasons;

**IT IS ORDERED** that Defendant IOC's Motion for Summary Judgment[182] is **GRANTED IN PART** and **DENIED IN PART.** IOC's Motion for Summary Judgment is **GRANTED** with respect to Offshore's indemnity claim and indemnity insurance coverage claim and **DENIED** with respect to Offshore's claim for defense costs.

**New Orleans, Louisiana, this 22nd day of March, 2023.**

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[182] R. Doc. 65.